UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Karen K. Calvert, | ) | Civil Action No. 5:21-1358-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Kilolo Kijakazi,[1] Acting Commissioner | ) | |
| of Social Security Administration, | ) | |
| | ) | |
| | ) | |
| Defendant. | | |

This social security matter is before the court pursuant to 28 U.S.C. § 636(c) and Local Civil

Rule 83.VII.02 (D.S.C.) for final adjudication, with the consent of the parties, of Plaintiff's petition

for judicial review. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial

review of a final decision the Commissioner of Social Security ("Commissioner"), denying her claim

for Disability Insurance Benefits ("DIB") pursuant to the Social Security Act ("the Act"). Having

carefully considered the parties' submissions and the applicable law, the court affirms the

Commissioner's decision for the reasons discussed herein.

I.      Relevant Background

   A.      Procedural History

In January 2017, Plaintiff filed for DIB alleging she became disabled on September 9, 2016.

Tr. 277-80. Plaintiff was last insured as of September 30, 2017. Tr. 12. After being denied initially,

Tr. 101, and upon reconsideration, Tr. 113, Plaintiff requested a hearing before an Administrative

Law Judge ("ALJ"), Tr. 152. After a July 19, 2019 hearing at which Plaintiff was represented by

counsel, *see* Tr. 30-56, ALJ James M. Martin issued an unfavorable decision denying Plaintiff's claim

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to
Rule 25(d) of the Federal Rules of Civil Procedure, the court substitutes Kilolo Kijakazi for Andrew
Saul as Defendant in this action.

in a July 31, 2019 decision, Tr. 121-30. At Plaintiff's request, the Appeals Council reviewed the decision and remanded it for further evaluation. Tr. 135-37. On remand, ALJ Martin held an administrative hearing during which Plaintiff, who again appeared with counsel, appeared and testified. A medical expert ("ME") and a vocational expert ("VE") also testified. Tr. 57-89. On January 15, 2021, the ALJ issued a decision denying Plaintiff's application. Tr. 9-29. Plaintiff again requested review of the decision from the Appeals Council. Tr. 273. On April 12, 2021, the Appeals Council denied the request, making the ALJ's January 15, 2021 decision the Commissioner's final decision for purposes of judicial review. Tr. 1-6. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed May 6, 2021. ECF No. 1.

B.    Plaintiff's Background

Born January 28, 1965, Plaintiff was 49 years old at the time of her alleged onset date of September 9, 2016, and 55 years old at the time of her hearing. Tr. 42, 67. In her January 2017 Disability Report-Adult form, Plaintiff indicated she graduated from high school and completed two years of college. Tr. 320. She did not attend special education classes, and did not complete specialized training. Tr. 320. Plaintiff indicated that in the 15 years prior to her becoming unable to work she had worked as an administrative assistant, a secretary, and a bartender. Tr. 320. Plaintiff indicated she stopped working on September 9, 2016 because of her conditions, which she listed as: "neuropathy, myalgia, mytosis, depression, anxiety, arthritis, carpal tunnel, cubital tunnel, diabetes, and edema in legs." Tr. 319. Plaintiff indicated she was 5'10" tall, weighed 260 pounds, and her conditions caused her pain or other symptoms. *Id.*

In a Disability Report-Appeal dated July 18, 2017, Plaintiff indicated there had been changes to her previously reported conditions in that, as of May 2017, her "[b]reathing is worse due to asthma. Nerve pain is worse. Joint pain is worse. Depression is worse." Tr. 349. Plaintiff had no new conditions to report at that time. Tr. 349. In a Disability Report-Appeal dated October 4, 2017,

Plaintiff indicated she had no changes or new conditions to report. Tr. 357.

    C.      Administrative Proceedings

On December 29, 2020, Plaintiff appeared with counsel at an administrative hearing and testified regarding her application for DIB. Tr. 57. Also appearing before ALJ Martin were Plaintiff's counsel; VE Jeannie Deal; and ME Dr. Nikerson Geneve. Tr. 57. The hearing was conducted telephonically because of the extraordinary circumstances presented by the coronavirus pandemic. Tr. 61. At the start of the hearing the ALJ noted the matter had been remanded by the Appeals Council and stated they were "starting over" at the hearing after remand. Tr. 60. Counsel for Plaintiff indicated the record was complete; documents in the evidentiary file were received into evidence without objection. Tr. 62.

    1.  Plaintiff's Testimony

In response to questions from her attorney Plaintiff indicated she was 5'10" tall and weighed 260 pounds. Tr. 67. Plaintiff indicated she had a two-year associates degree in graphic arts. Tr. 67. Plaintiff indicated her last work was with Laurens[2] County DDSN; she quit that job in September 2016 because she was experiencing a lot of pain, having difficulty doing her job, almost feel asleep at her desk several times, and was "on the verge of being fired." Tr. 68. Plaintiff's counsel reminded her that the focus at the hearing was her impairments as they existed in 2017. Tr. 68. Plaintiff indicated that pain was the most significant problem that limited her ability to work in 2017. Tr. 68-69. Plaintiff said she had "constant" pain in her "hands, arms, shoulders, legs, feet. Basically, from everywhere." Tr. 69. Plaintiff noted she was diagnosed with fibromyalgia when she saw Dr. Mader, a rheumatologist, in March of 2018. Tr. 69. Dr. Mader then referred Plaintiff back to her family care

---

[2] Although the transcript phonetically indicated Plaintiff had worked in "Lawrence" County, Plaintiff's earnings records indicate she worked for the Laurens County Department of Disabilities and Special Needs. Tr. 281-84.

doctor. Tr. 69. Plaintiff saw a neurologist, Dr. Warner, who diagnosed her with polyneuropathy. Tr. 69. Plaintiff indicated Dr. Warner made the diagnosis after a nerve conduction study. Tr. 69. Plaintiff attributes the following symptoms to her neuropathy: "leg pain and swelling, the numbness, not being able to stand long, not being able to sit long." Tr. 70. Plaintiff said she experienced swelling in her legs, feet, and hands. Tr. 70. Plaintiff said she was advised to elevate her legs and feet above her heart; she estimates she sits that way approximately 50-60% of her day. Tr. 70. Plaintiff indicated she takes a fluid pill "in her blood pressure medication." Tr. 70.

Plaintiff said that, in 2017, her energy level was very low, and she mainly took Aleve, Tylenol, or Motrin for pain. Tr. 71. Plaintiff also indicated she has been on Gabapentin for pain but that it increased her fatigue and made her "kind of foggy[.]" Tr. 71. Plaintiff also tried to alleviate pain by sitting and sleeping. Tr. 71.

Plaintiff testified that, as of 2017, she could sit up with her feet on the floor for "15 minutes at most." Tr. 71-72. She said she could stand five to ten minutes and walk for five minutes before needing to stop and rest. Tr. 72. Plaintiff said she could not lift or carry "much" comfortably, noting she had carpal tunnel in addition to the neuropathy and added weight; she said she had to use two hands to lift milk or tea from the refrigerator. Tr. 72. Plaintiff also indicated she would drop things and had a problem with gripping or holding things. She also indicated she does not type well anymore. Tr. 72.

Plaintiff said that in 2017 her weight was "close to 300 pounds," and her doctor told her the weight contributed to "some of [her] pain but not all of it." Tr. 73. Plaintiff indicated she was out of breath a lot and could not get up and down or move around well. Tr. 73. Plaintiff noted she had asthma and used inhalers and could not lift things without being out of breath. Tr. 73.

Plaintiff said she has depression and now sees her primary care doctor, Dr. Joshua Holmes, for the depression. Tr. 73. Plaintiff said she was on Cymbalta for pain and depression, but she had

bad reactions to it and went back on Gabapentin for pain. Tr. 74. Plaintiff said they were still trying to figure out what to do about her depression. Tr. 74. Plaintiff indicated she "seem[ed] to be getting worse rather than better." Tr. 74.

The ALJ then began asking Plaintiff questions. Plaintiff indicated she had a driver's license and, in 2016 and 2017, she was driving 30-40 minutes to get back and forth to work. Tr. 74-75. Now that she no longer works, she said she only drove when her husband was not at home. Tr. 75. Plaintiff said her husband has retired from his job; they have no children under the age of 18 living at home. Tr. 75.

Plaintiff said that, as of September 2017, she did not have any community activities she enjoyed doing. Tr. 75. Plaintiff indicated that she used to love to sew and do crafts, but noted she can no longer do those things because of her "hands and sitting and everything." Tr. 75.

### 2. ME's testimony

The ALJ then called on ME Nikerson Geneve, D.O. to testify. Tr. 76. Plaintiff's counsel stipulated to Dr. Geneve's qualifications as an expert. Tr. 76. After being sworn in, the ALJ began asking questions of Dr. Geneve. The ALJ asked whether Dr. Geneve would give a neutral and impartial opinion although the government was paying the expert fee. Dr. Geneve answered in the affirmative. Tr. 76.

*Because the ALJ's consideration of Dr. Geneve's opinion testimony is a subject of Plaintiff's appeal, details concerning the ME testimony are set forth in the analysis section, supra.*

### 3. VE's Testimony

VE Deal identified Plaintiff's past relevant work ("PRW") as that of administrative clerk, Dictionary of Occupational Titles ("DOT") 219.362-010, specific vocational preparation ("SVP") 4; light exertion generally, but medium exertion as performed by Plaintiff; and receptionist, DOT 237.367-038, SVP 4, sedentary generally but heavy as performed by Plaintiff. Tr. 82-83. Plaintiff

stipulated to VE Deal's characterization of PRW at the initial administrative hearing. Plaintiff stipulated to VE Deal's qualifications. Tr. 83.

The ALJ asked the VE to assume an individual of Plaintiff's age, education, and work experience, who would be limited as follows:

> [T]his individual would be limited to less than the full range of sedentary work. That is to say this hypothetical individual could lift and/or carry ten pounds occasionally, less than ten pounds frequently. Could sit for six hours in an eight-hour day. Stand and/or walk for two hours each in an eight-hour day. And with regard to pushing and pulling this individual could frequent—could occasionally operate foot controls with the right foot, frequently operate foot controls with the left foot. And, frequently operate hand controls bilaterally This individual could frequently handle and finger bilaterally. Occasionally climb ramps and stairs, never ladders, ropes, or scaffolds. Frequently balance, occasionally stoop, kneel, crouch, and crawl. This individual can never be in an environment with unprotected heights but occasionally could be in an environment with dusts, odors, fumes, and pulmonary irritants, as well as extreme heat and cold.

Tr. 84-85. The ALJ asked if the hypothetical individual could perform any of Plaintiff's past work, and the VE responded that Plaintiff would be able to perform the receptionist job as it is generally performed but not as actually performed. Tr. 85. The VE indicated Plaintiff's PRW as an administrative assistant would be precluded. Tr. 85. The ALJ asked whether there would be any transferable skills from the light administrative assistant job to the hypothetical RFC; the VE responded in the negative. Tr. 85-86.

The VE confirmed that her testimony did not conflict with the DOT; she noted, though, that a few areas required her to rely on her training, education, and job placement experience. Tr. 86. The VE indicated that foot controls are not always addressed so specifically in the DOT, so she used her experience as to the foot controls and as to climbing. Tr. 86.

The ALJ then asked the VE what the impact would be if, in addition to these limitations, the individual had normal breaks and also would be off-task 15% of the time in an eight-hour workday. Tr. 86. The VE opined that such a limitation would be work-preclusive. Tr. 86. The ALJ asked

whether this opinion as to the time-off-task was consistent with the DOT. The VE responded that it was not addressed by the DOT or companion publications, so she had relied on her professional experience and training. Tr. 86-87.

Plaintiff's counsel then asked the VE whether there would be any work for the individual who was absent at least two days per month. The VE replied there would be no work under those circumstances. Tr. 87. Counsel then asked whether adding to hypothetical one an "additional non-exertional limitation due to a combination of pain, fatigue, side effects of medication that the individual is also limited to more simple, routine, repetitive-type tasks thinking about –you know, reasoning level 1 or 2 type things[.]" Tr. 87. The VE testified that past work would be precluded in that situation. Tr. 87.

After a brief closing statement by Plaintiff's counsel, the hearing was closed. Tr. 88.

II.    Discussion

 A.    The ALJ's Findings

In his January 15, 2021 decision, the ALJ made the following findings of fact and conclusions of law:

1. The claimant last met the insured status requirements of the Social Security Act on September 30, 2017.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of September 9, 2016, through her date last insured of September 30, 2017 (20 CFR 404.1571 *et seq*.).

3. Through the date last insured, the claimant had the following severe impairments: polyneuropathy and fibromyalgia (20 CFR 404.1520(c)). [] The claimant has the following non-severe impairments: diabetes mellitus, obesity, gastroesophageal reflux disease (hereinafter GERD), essential hypertension, lumbar spondylosis, arthritis, allergic rhinitis, hyperlipidemia, and depression.

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of

one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1
(20 CFR 404.1520(d), 404.1525, 404.1526).

5. After careful consideration of the entire record, I find that, through the date
last insured, the claimant had the residual functional capacity to perform
sedentary work as defined in 20 CFR 404.1567(a) except the claimant can
lift and carry 10 pounds occasionally and lift and carry less than 10 pounds
frequently. She can sit for 6 hours, stand for 2 hours, and walk for 2 hours;
she can operate foot controls with right foot occasionally; she can operate
foot controls with left foot frequently. She can operate hand controls with
bilateral hands frequently. She can handle items frequently with her
bilateral hands. She has fingering limitations frequently with her bilateral
hands; she can climb ramps and stairs occasionally, never climb ladders,
ropes, or scaffolds, balance frequently stoop occasionally, kneel
occasionally, crouch occasionally, and crawl occasionally. The claimant
can never work at unprotected heights; she can work with moving
mechanical parts occasionally; and she can operate a motor vehicle
occasionally; she can be exposed to dust, odors, fumes and pulmonary
irritants frequently, in extreme cold frequently, and in extreme heat
frequently.

6. Through the date last insured, the claimant was capable of performing past
relevant work as a receptionist. This work did not require the performance
of work-related activities precluded by the claimant's residual functional
capacity (20 CFR 404.1565).

7. The claimant has not been under a disability, as defined in the Social
Security Act, at any time from September 9, 2016, the alleged onset date,
through September 30, 2017, the date last insured (20 CFR 404.1520(f)).

Tr. 14-15, 18, 20, 24.

    B.    Legal Framework

        1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for

benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined

as:

inability to engage in any substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected to result in death
or which has lasted or can be expected to last for a continuous period of not less than
12 months[.]

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the listed impairments, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146, n.5 (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 428 F.2d 1157, 1157-58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (explaining that, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high,"

10

as it means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that the conclusion is rational. *See Vitek*, 428 F.2d at 1157-58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

III.    Analysis

Plaintiff argues that (1) the ALJ failed to properly evaluate the opinion of ME Dr. Nickerson Geneve without providing legally sufficient reasoning; (2) the ALJ failed to properly assess the functional limitations of Plaintiff's obesity and her mental limitations; and (3) the Commissioner's final decision denying benefits was constitutionally defective. Pl. Br. 1-2, ECF No. 19.[4] The Commissioner argues that substantial evidence supports the ALJ's decision, including the ALJ's consideration of Plaintiff's mental impairments and physical limitations. Def. Br. 11, 17, ECF No. 22.

A.  The ALJ's treatment of ME Dr. Geneve's opinion testimony

1.  Applicable law

Because Plaintiff's claim was filed before March 27, 2017, the standard for evaluating medical opinion evidence as set forth in 20 C.F.R. § 404.1527 applies.[5] The regulations define "medical opinions" as "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still

---

[4] In Plaintiff's principal brief, she discusses the constitutional argument first. However, Plaintiff suggests that the court need only reach this issue if the other arguments do not result in remand. Reply 6, ECF No. 25. Accordingly, the court will save this argument for last.
[5] For claims filed on or after March 27, 2017, the regulations changed as to how adjudicators would consider and articulate medical opinions. *See* 20 C.F.R. § 404.1520c.

do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1). For purposes of the regulations, an "acceptable medical source" includes a licensed physician or psychologist. *Id.* § 404.1502(a). The regulation provides that, "[r]egardless of its source," the ALJ "will evaluate every medical opinion" received. *Id.* § 404.1527(c). Generally, the opinions of treating physicians are entitled to greater weight than other evidence and the regulations have enumerated particular factors for ALJs to consider when evaluating those opinions. *See* 20 C.F.R. § 404.1527(c)(2). The regulation notes that treating sources "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." *Id.* The ALJ must consider this nonexclusive list of factors to determine what weight to give medical opinions in the record: "(1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005); *see* 20 C.F.R. § 404.1527(c) (listing factors).

"'When evaluating medical opinion evidence, the ALJ need not accept or reject an opinion in full. Rather, the ALJ should give weight to the medical opinion to the extent that it is supported by the evidence of record.'" *Ford v. Berryhill*, No. 2:17-CV-0525-TMC-MGB, 2018 WL 4519337, at *5 (D.S.C. June 19, 2018) (quoting *Kozel v. Astrue*, Civil No. JKS-10-2180, 2012 WL 2951554, at *5 (D. Md. July 18, 2012) (citing 20 C.F.R. § 404.1527)) *report and recommendation adopted,* No. 2:17-CV-0525-TMC, 2018 WL 3968532 (D.S.C. Aug. 20, 2018). An ALJ is not required to accept all of the conclusions and limitations set forth in a medical source opinion. *Armentrout v. Astrue*, No. 3:10-cv-504, 2011 WL 4625931, at *7 (E.D. Va. June 2, 2011), *report and recommendation adopted,* No. 3:10-cv-504, 2011 WL 4625912 (E.D. Va. Oct. 3, 2011) ("While the ALJ assigned "significant" probative weight to the opinion, the ALJ was not then required to adopt every limitation and

incorporate them into the RFC analysis."); *Bacnik v. Colvin*, No. 1:12-cv-801, 2014 WL 3547387, at

*4 n.7 (M.D.N.C. July 17, 2014) ("An ALJ is not required to adopt every opinion in a non-examining

medical expert's report, even when according the report great weight overall.").

    2.  Dr. Geneve's opinion testimony[6]

At the administrative hearing Dr. Geneve indicated he had "read the relevant portions of the

file regarding [Plaintiff's] medical condition or conditions and listened to her testimony." Tr. 77. Dr.

Geneve discussed several record documents: he noted that Exhibit 7F, pages 1 and 2 (Apr. 10, 2017

Piedmont Neurology Office Visit Record, found at Tr. 538-39) contains the "documentation of the

polyneuropathy" as assessed by the neurologist. Tr. 77. Dr. Geneve also noted that Exhibit 17F, page

1 (March 18, 2018 Lakeland Family Practice Office Visit Record, found at Tr. 852) and 21F, page 2

(Aug. 27, 2019 SMG Orthopaedics Office Visit Record, found at 910) indicate several other

impairments, including fibromyalgia. Tr. 77. Dr. Geneve noted the neuropathy and fibromyalgia were

again mentioned in documentation from 2020. Tr. 78 (referencing Exhibit 22F, page 3, Aug. 27, 2020

Uptown Family Practice Office Visit Record, found at Tr. 930).

The ALJ asked Dr. Geneve whether, in his opinion, Plaintiff's impairments were severe

impairments; Dr. Geneve answered in the affirmative. Tr. 78. Dr. Geneve opined that Plaintiff's issues

with polyneuropathy and fibromyalgia seem to be the most significant in terms of Plaintiff's

functional capacity. Tr. 78 (referencing record documents, including Exhibit 20F, page 4 (Mar. 28,

2018 Greenwood Rheumatology Office Visit Record, found at Tr. 902), which indicated Plaintiff was

assessed with "the other CRP which is an inflammatory marker" related to fibromyalgia). Dr. Geneve

---

[6] The ALJ discussed opinions rendered by other medical sources, both treating and nontreating, explaining the weight he gave to their opinions and why. *See, e.g.*, Tr. 22-24 (discussing opinions of consulting examiner James Donald Franklin, III, M.D. (2011; Exhibit B1F); consulting examiner Ron O. Thompson, Ph.D. (2012 , Exhibit B2F); treating physician Joshua Brady Holmes, M.D. (Nov. 2020, Exhibit B24F), agency examiners (Exhibits B2A and B5A)). Plaintiff does not take issue with the ALJ's handling of other experts' opinions.

opined Plaintiff's impairments did not meet or medically equal any impairments described in the listing of impairments, noting the specific listings considered were 1.02, 1.04, and 11.14. Tr. 79.

Dr. Geneve opined that, based on education and experience, Plaintiff would be able to occasionally lift up to ten pounds; sit up to six hours of an eight-hour day; and stand/walk in combination for two hours of an eight-hour day. Tr. 79. Plaintiff could frequently use both hands and the left foot. Tr. 79-80. Because of plantar fasciitis in the right foot, she could use it occasionally, Tr. 80. Plaintiff could never climb scaffolds or ladders; she could occasionally climb stairs and ramps. Tr. 80. Plaintiff could occasionally stoop, kneel, crouch, and crawl. Tr. 80. Plaintiff could frequently balance. Tr. 80. Plaintiff could have no concentrated exposures to dusts, odors, fumes, pulmonary irritants, or extreme cold or heat. Tr. 80. Plaintiff may occasionally be exposed to moving mechanical parts, operating a vehicle, or vibrations. She could never go to unprotected heights. Tr. 80. The ALJ asked whether the ME had any other opinions in the case; the ME responded in the negative. Tr. 80.

Plaintiff's counsel then examined Dr. Geneve. Their brief colloquy follows:

Q. (from counsel): Dr. Geneve, is it true that with fibromyalgia that symptoms can in fact wax and wane? One day you feel a little better, another day you may feel worse, is that accurate?
A. (from ME): Yes.
Q.: And would it be consistent that there are –there are going to be some really bad days that the individual may just need to lay down most of the day?
A.: It's possible.
Q.: And is it reasonable that that could happen at least two days a month?
A.: It's possible.
Q.: Okay. Now is fatigue, drowsiness, grogginess are those typical side effects of the medication Gabapentin?
A.: The medication Gabapentin it has –it does have several side effects and fatigue, drowsiness really it could be somnolence which is – you know, in other words forms of sleepiness is the only common side effect but you can also have fatigue as you mentioned. You can have some degree sometimes dizziness as well, so.
Q.: Okay
A. Those are common reactions of Gabapentin.

Tr. 80-81. Plaintiff's counsel concluded his questions. After the ALJ clarified the ME's testimony regarding use of foot controls, Dr. Geneve was excused. Tr. 81-82.

### 3. The ALJ's consideration of Dr. Geneve's opinion testimony

The ALJ recounted Dr. Geneve's opinion testimony and found that Dr. Geneve had "significant programmatic experience and his opinions are tied to specific sections of the record." Tr. 23 (noting Dr. Geneve considered Plaintiff's impairments as set out in Exhibit B7F and considered Exhibit B20F concerning fibromyalgia as of March 2018, opining it had been an issue months before). The ALJ recounted the RFC as set out by Dr. Geneve. Tr. 23. The ALJ also noted Dr. Geneve had indicated Plaintiff "might have good days and some really bad days, probably two days a month." Tr. 23. It was also noted that "Gabapentin could cause fatigue, somnolence, and dizziness." Tr. 23. The ALJ then stated he had assigned Dr. Geneve's opinion testimony "great weight and his residual functional capacity was basically adopted." Tr. 23. The ALJ noted that, where he diverged in reaching Plaintiff's RFC, he did so because he had "weighed all of the evidence, including all of the testimony and as well as the argument of counsel, and Dr. Geneve only heard the claimant's testimony." Tr. 23.

### 4. Analysis

Plaintiff ascribes error to the ALJ's discounting of the portions of Dr. Geneve's testimony that derive from the responses to questions by Plaintiff's counsel—that is, the testimony that it was "possible" that one with fibromyalgia could have "at least two days a month" that were "really bad" and would require the individual to lie down most of the day; and testimony that the "common reactions" of Gabapentin include sleepiness, fatigue, and dizziness. Pl. Mem. 11-13 (referencing Tr. 80-81). Plaintiff asserts the ALJ did not do enough to explain his reasons for discounting Dr. Geneve's opinions that Plaintiff could possibly have two bad days a month and that a medication she took, Gabapentin, could cause fatigue, drowsiness, and dizziness. Plaintiff submits that a portion of the reason the ALJ gave for having "diverged" at all from the RFC as set out by Dr. Geneve was erroneous. Plaintiff's argument reads the ALJ's conclusion to the paragraph concerning Dr. Geneve

as indicating that Dr. Geneve "heard only the claimant's testimony[]" and based his opinion on that testimony alone. Pl. Mem. 13-14.

As is apparent from the ALJ's discussion of Dr. Geneve's opinion, however, Dr. Geneve considered record evidence—including Exhibits B7F and B20F—in reaching his opinions and RFC. Tr. 23. The ALJ's concluding sentence in that paragraph could be read as a finding that Dr. Geneve had only *heard* the testimony of Plaintiff not the argument of counsel. Further, the ALJ did what he was supposed to do—review and weigh all of the evidence. Importantly, the small portion of Dr. Geneve's testimony on which Plaintiff now bases her argument is the rather equivocal responses of Dr. Geneve to counsel's skilled "cross-examination-type" questions of Dr. Geneve. Review of the hearing transcript indicates Dr. Geneve did no more than agree with counsel that one with fibromyalgia would have symptoms that waxed and waned and it was "possible" an individual could have two bad days a month. Tr. 81. Similarly, his responses concerning Gabapentin clearly emphasized he was noting the "common reactions" of the drug. Dr. Geneve did not specifically opine that Plaintiff herself had those particular symptoms. *Cf.* Tr. 80 (Dr. Geneve's advising that his opinions given prior to examination by Plaintiff's counsel "would be it").

Here, the ALJ explicitly set out the appropriate regulatory framework, noting all medical opinions are evaluated under 20 C.F.R. § 404.1527. Tr. 21 (listing regulatory factors). The ALJ gave great weight to the RFC as set out by Dr. Geneve, noting any divergence was because the ALJ had weighed all evidence and heard testimony of Plaintiff and argument of counsel. Tr. 23. While Dr. Geneve's responses to cross-examination, if specifically intended for Plaintiff, could undercut the RFC as set out by Dr. Geneve and the ALJ, those responses do not set out specific limitations on Plaintiff. *See* Def. Br. 25 (noting statements in response to counsel's questions were "non-committal"). Further, to the extent they could be construed as doing so, the ALJ appropriately weighed all evidence and found the RFC as set out by Dr. Geneve and by the ALJ are supported by

substantial evidence. Plaintiff also submits the ALJ's failure to discuss these specific portions of Dr. Geneve's testimony runs afoul of the court's reminder in *Arakas* that the ALJ "may not substitute his own lay opinion for a medical expert's when evaluating the significance of clinical findings." *Arakas v. Comm'r*, 983 F.3d 83, 108 (4th Cir. 2020). Here, however, the portion of Dr. Geneve's testimony at issue does not include the discussion of "clinical findings" so much as the expert's non-Plaintiff-specific responses to queries from Plaintiff's counsel. *Cf. Arakas*, 983 F.3d at 108 (finding ALJ erred in offering lay analysis of what an MRI could or could not demonstrate).

The responsibility for weighing evidence falls on the Commissioner, not the reviewing court. *See Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). "An ALJ's determination as to the weight to be assigned to a medical opinion will generally not be disturbed absent some indication that the ALJ has dredged up 'specious inconsistencies,' or has not given good reason for the weight afforded a particular opinion." *Koonce v. Apfel*, 166 F.3d 1209 (4th Cir. 1999) (per curiam) (unpublished) (internal citation & quotation omitted). Accordingly, the court finds the ALJ's evaluation of the RFC as set out by Dr. Geneve in his ME testimony is in keeping with the regulations and is supported by substantial evidence.

B.  The ALJ's assessment of Plaintiff's obesity and mental limitations

1.  Obesity

Plaintiff argues the ALJ erred by not finding Plaintiff's obesity to be a severe impairment and by not adequately considering the impact her obesity may have had on her other impairments and her RFC. Pl. Br. 17-22. The Commissioner counters that the ALJ appropriately considered Plaintiff's obesity and his finding that obesity did not increase her functional limitations is supported by substantial evidence. Def. Br. 27-30.

As an initial matter, because Plaintiff's application was filed in January 2019, Plaintiff argues that SSR 02-1p, rather than SSR 19-02p, should have been used to evaluate Plaintiff's obesity. The

Commissioner notes, however, that SSR 19-2p became effective on May 20, 2019, well before the ALJ's January 15, 2021 decision now under review. Def. Br. 27-28. *See* SSR 19-2P, 2019 WL 2374244, n.14 (S.S.A. May 20, 2019) ("We will apply this SSR to new applications filed on or after the applicable date of the SSR and to claims that are pending on and after the applicable date. This means that we will use this SSR on and after its applicable date in any case in which we make a determination or decision. We expect that Federal courts will review our final decisions using the rules that were in effect at the time we *issued the decisions*." (emphasis added)). Accordingly, the ALJ appropriately applied SSR 19-02p.[7]

At Step 2 the ALJ acknowledged Plaintiff had a Body Mass Index ("BMI") of 37.3, which indicates a diagnosis of obesity. Tr. 16 n.1. The ALJ continued:

> When, as here, there is evidence that the claimant has obesity, I must consider the effects obesity has in causing or contributing to the claimant's musculoskeletal, respiratory and cardiovascular impairments (SSR 19-02p). This is based on the Agency's recognition that the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately. Moreover, SSR 19-02p requires that I consider the effects of obesity not only under the listings, but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity. However, SSR 19-02p also states that we will not make assumptions about the severity or functional effects of obesity combined with other impairments. Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment. In this case, the claimant's weight does not increase her functional limitations as the functional limitations in her legs is attributed to her polyneuropathy. For example, the claimant exhibited diminished deep tendon reflexes in the knees and ankles on April 10, 2017 (Exhibit B7F, page 1). While her rheumatologist suggested exercise and noted her body habitus might be to blame for an elevated CRP (Exhibit B20F), the claimant did not testify as to any problem or possible limitation due to her weight.
>
> As these impairments [including obesity] cause no more than minimal limitation on the claimant's ability to perform basic work activities, they are determined to be non-severe.

Tr. 16-17.

---

[7] In any event, as noted by the Commissioner, any error in the use of SSR 19-02p rather than SSR 02-1p would be harmless.

The court finds Plaintiff's allegation of error in the ALJ's failure to categorize obesity a severe impairment at Step 2 to be without merit. Plaintiff references her weight and BMI as support for her claim that her obesity should have been considered "severe." Pl. Br. 19. However, "[n]o specific weight or BMI establishes obesity as a severe impairment within the disability program." SSR 19-2p, 2019 WL 2374244, at *2; *see also* SSR 02-1p, 2002 WL 34686281, at *4 ("There is no specific level of weight or BMI that equates with a 'severe' or a 'not severe' impairment. Neither do descriptive terms for levels of obesity (e.g., 'severe,' 'extreme,' or 'morbid' obesity) establish whether obesity is or is not a 'severe' impairment for disability program purposes.").

Further, as noted by the Commissioner, the Step 2 determination as to whether Plaintiff has a severe impairment "is a *de minimis* screening device to dispose of groundless claims." *Jones v. Colvin*, No. 8:13-375-RBH, 2014 WL 4269156, at *16 (D.S.C. Aug. 29, 2014) (quoting *McCrea v. Comm'r Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004)). When, as here, the ALJ finds at least one impairment to be severe, whether he finds other diagnoses to be severe at this step is largely irrelevant. *See* 20 C.F.R. § 404.1520(c) (the relevant inquiry at step 2 is whether "you do not have any" severe impairments); 404.1545(a)(2) (RFC determination not affected by severe/non-severe distinction); *Martinez v. Astrue*, No. 11-850, 2012 WL 3580675, at *10 (D.S.C. July 30, 2012) ("A finding of a single severe impairment at step two of the sequential evaluation is enough to ensure that the factfinder will progress to step three."). Here, the ALJ found that Plaintiff had two severe impairments and then proceeded with the sequential evaluation process. Tr. 15. Thus, any perceived error in finding Plaintiff's obesity to be a nonsevere impairment would be harmless.

In addition, Plaintiff has not shown that her obesity limited her ability to perform basic work activities, as is required to establish a severe impairment. 20 C.F.R. § 404.1522. An impairment or combination of impairments is not severe when medical evidence establishes only a slight

abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to perform basic work activities. 20 C.F.R. § 404.1420a(d)(1).

Following the strictures of SSR 19-2p, the ALJ specifically considered "the effects obesity has in causing or contributing to [Plaintiff's] musculoskeletal, respiratory and cardiovascular impairments" Tr. 16-17. The ALJ specifically referenced Plaintiff's severe impairment of polyneuropathy and CRP (which can be related to her severe impairment of fibromyalgia) in this discussion.

> [Plaintiff's] weight does not increase her functional limitations as the functional limitations in her legs is attributed to her polyneuropathy. For example, the claimant exhibited diminished deep tendon reflexes in the knees and ankles on April 10, 2017 (Exhibit B7F, page 1). While her rheumatologist suggested exercise and noted her body habitus might be to blame for an elevated CRP (Exhibit B20F), the claimant did not testify as to any problem or possible limitation due to her weight.

Tr. 17. Plaintiff's suggestion that more is required is unavailing. As the ALJ noted, Plaintiff did not indicate any specific issues related to obesity. Further, although the rheumatologist, Dr. Mader, noted Plaintiff's weight could contribute to an elevated CRP, Dr. Mader noted no functional limitations as a result. *See* Tr. 902.

Substantial evidence supports the ALJ's consideration of Plaintiff's obesity. The ALJ did what SSR 19-2p requires. That Plaintiff points to pieces of evidence that she believes support a different outcome does not change the court's ruling. "The record simply does not demonstrate that Plaintiff's obesity, alone or together with other impairments, renders Plaintiff more limited than her RFC suggests, nor does it demonstrate that Plaintiff is disabled under the Act." *Weaver v. Colvin*, No. 1:10CV582, 2013 WL 3989561, at *10 (M.D.N.C. Aug. 2, 2013) *report and recommendation adopted,* No. 1:10-CV-582, 2013 WL 4768178 (M.D.N.C. Sept. 5, 2013). Accordingly, the

undersigned finds that the ALJ's consideration of the Plaintiff's obesity is consistent with SSR 19-2p.[8]

### 2. Mental limitations

Plaintiff's final substantive allegation of error relates to the ALJ's failure to include any mental functional limitations in her RFC despite having found Plaintiff had some "mild" limitations related to her nonsevere impairment of depression. Pl. Br. 22-24. To be clear, Plaintiff does not argue that she had anything more than "mild" limitations as a result of her depression. The Commissioner responds that the ALJ's findings that Plaintiff had no work-related mental limitations are supported by substantial evidence. That the ALJ found "mild" limitations in two areas did not require the imposition of limitations. Def. Br. 31-33.

The ALJ also found Plaintiff's medically determinable impairment of depression to be nonsevere. Tr. 17. When mental impairments are alleged, the ALJ is to apply the "special technique" to determine the severity of the mental impairments. 20 C.F.R. § 404.1520a. The ALJ is required to rate the limitations in four broad functional areas: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself (known as "paragraph B criteria" for mental disorders). *Id.* § 404.1520a(c)(3). The ALJ uses a five-point scale to rate a claimant's limitations in these functional areas: none, mild, moderate, marked, and extreme. *Id.* § 404.1520a(c)(4). The rating is based on the extent to which the claimant's impairment "interferes with [her] ability to function independently, appropriately, effectively, and on a sustained basis." *Id.* § 404.1520a(c)(2). If rating of a limitation is "none" or "mild," then the ALJ

---

[8] Here, at best, any error is harmless as Plaintiff has not identified any *functional limitations* that can be attributed to obesity. *McCall v. Colvin*, No. CIV.A. 5:14-1185-BHH, 2015 WL 5608205, at *3 (D.S.C. Sept. 22, 2015) (finding any error by ALJ for failing to find obesity as a severe impairment to be harmless where plaintiff did not reference "anything in the record concerning her alleged obesity's impact on her ability to work or perform any functional activities.").

generally concludes that the mental impairment is not severe. *Id.* § 404.1520a(d)(1). The regulation provides that the ALJ will consider whether *severe* impairments meet or equal a listed mental disorder. If a claimant has a severe mental impairment that does not meet or equal a listing, the ALJ will then assess the claimant's functional capacity. *Id.* § 404.1520a(d)(1), (2), and (3).

Here, the ALJ found Plaintiff had no limitations in the areas of understanding, remember or applying information; or interacting with others. The ALJ found Plaintiff had "mild limitation" in the functional area of concentration, persistence, or maintaining pace; and in the area of ability to adapt or manage oneself. Tr. 17. The ALJ then discussed Plaintiff's testimony regarding her daily activities, some of her prior work experiences, and her complaints of pain and limitations. The ALJ also discussed portions of several consultative examinations that related to these functional areas. Tr. 17-18.

Plaintiff argues the ALJ erred because the RFC did not account for the mild limitations in the paragraph "B" criteria areas of mental functioning the ALJ found at Step 2. Pl. Br. 22-24. Plaintiff cites extensively to a 2015 case from the Western District of North Carolina as support for this argument. *See Ashcraft v. Colvin*, No. 3:13CV417, 2015 WL 9304561, at *6-11 (W.D.N.C. Dec. 21, 2015) (remanding ALJ's decision based on the Fourth Circuit's ruling in *Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015); finding error in the ALJ's determination that claimant had mild limitations in certain of the paragraph-B areas without finding corresponding mental limitations in claimant's RFC).

Although the *Ashcraft* decision does seem to support Plaintiff's argument, the Commissioner submits that the weight of the authority among district courts in this Circuit find to the contrary. The court agrees with the Commissioner. Although the Fourth Circuit has not ruled on this precise issue, *Mascio* itself related to "moderate" limitations related to "severe" mental impairments. *Mascio*, 780 F.3d 632. Further, the court notes that the weight of the authority from other district courts in the

Circuit are contrary to *Ashcraft*'s ruling. *See Martin v. Saul*, No. 9:18CV3172, 2020 WL 2813788, at

*8 (D.S.C. Jan. 16, 2020) (unpublished) (collecting cases and noting that "most district court

decisions [in the Fourth Circuit] have found to the contrary" [of *Ashcraft*].), *recommendation adopted*,

2020 WL 1329395 (D.S.C. Mar. 23, 2020). *See Morrison v. Berryhill*, No. 1:16CV337, 2018 WL

1311207, at *5 (W.D.N.C. Feb. 8, 2018) (finding plaintiff's "heavy reliance on *Mascio* . . . [wa]s

misplaced" and noting that, since "about a month after the *Mascio* decision," many cases in the

Western District of North Carolina "have held that the requirements of *Mascio* do not necessarily

apply where a plaintiff is found to have *mild* limitations in CPP"), *recommendation adopted*, 2018

WL 1308139 (W.D.N.C. Mar. 13, 2018); *Thorp v. Berryhill*, 3:16CV70, 2018 WL 325318, at *3

(W.D.N.C. Jan. 8, 2018) (noting the "case differ[ed] markedly from *Mascio*" because the plaintiff

"had *mild* difficulties maintaining [CPP]" (emphasis added)); *Thompson v. Colvin*, 1:15CV234, 2016

WL 3610161, at *3 (W.D.N.C. July 1, 2016) ("The Court does not read *Mascio* to impose a duty on

ALJs to automatically or necessarily account for mild limitations in the RFC." (emphasis added)).

Thus, the weight of post-*Mascio* authority among the district courts in the Fourth Circuit does not

favor extending *Mascio* to mild limitation in CPP, particularly in cases in which no severe mental

impairments have been identified by the ALJ.

Here, the ALJ reasonably did not incorporate any mental work-related limitations in his RFC

finding because the evidence did not support that Plaintiff had any. At Step 2 of the sequential

evaluation process, the ALJ discussed the pertinent evidence concerning Plaintiff's mental health. Tr.

17. The ALJ noted that:

> The claimant's medically determinable mental impairment of depression did not cause
> more than minimal limitation in the claimant's ability to perform basic mental work
> activities and was therefore non-severe. As for the claimant's depression, she is taking
> medication, provided by her primary care physician. She has not had formal
> psychiatric or inpatient care; she has not seen a therapist. She testified at the second
> hearing that before 2017 her depression was bad, but she no longer took medication as
> she had a bad reaction to the Cymbalta. Because the claimant had a medically

> determinable mental impairment, I have considered the four broad areas of mental functioning set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1). These four broad areas of mental functioning are known as the "paragraph B" criteria.

Tr. 17. The ALJ also discussed Plaintiff's testimony at the hearing and her recounting of her activities of daily living to several consulting examiners. Tr. 17-18.  In addition, in discussing the opinion evidence as part of the RFC analysis, the ALJ considered the 2012 consultative mental examination of Ron O. Thompson, Ph.D., finding no "remarkably limiting or impairing factors." Tr. 22-23 (Exhibit B2F). While the ALJ gave Dr. Thompson's opinion "minor weight," he noted it was "consistent with a non-severe mental impairment." Tr. 23.

The court is satisfied that the ALJ's RFC is supported by substantial evidence. There was no error in the ALJ's finding "mild" impairments based on nonsevere mental impairments but imposing no mental restrictions in the RFC.

### 3. Plaintiff's argument regarding alleged constitutional defect

Plaintiff also argues the Commissioner's decision denying her DIB claim was constitutionally defective because the Act's provision that limits the President's authority to remove the Presidentially-appointed, Senate-confirmed Commissioner of Social Security without good cause, 42 U.S.C. § 902(a)(3), violates the separation of powers. Plaintiff submits that the appropriate remedy for this violation of the separation of powers is for a new hearing before a properly appointed official. Pl. Br. 5-11. The Commissioner counters that Plaintiff's argument fails because she is unable to demonstrate compensable harm. Def. Br. 10-22.

As recently noted by Judge Mary Geiger Lewis, Section § 902(a)(3) of Title 42 "does in fact violate the separation of powers to the extent it is construed as limiting the President's authority to remove the Commissioner of Social Security without good cause, but '[t]he conclusion that the removal restriction is [C]onstitutionally unenforceable does not affect the validity of the remainder

of the [S]tatute.'" *Moore v. Kijakazi*, No. CV 6:20-03951-MGL, 2022 WL 702518, at *4–5 (D.S.C. Mar. 9, 2022) (quoting Off. of Legal Couns., U.S. Dep't of Just., Constitutionality of the Comm'r of Soc. Sec.'s Tenure Prot., 2021 WL 2981542 (July 8, 2021)).[9]

As argued by the Commissioner, the United States Supreme Court recently explained in *Collins v. Yellen*, 141 S. Ct. 1761 (2021), that, even where an unconstitutional statutory removal restriction exists, a plaintiff seeking relief on that basis must show that the "unconstitutional provision . . . inflict[ed] compensable harm." *Id.* at 1787–89; *see* Def. Br. 15-16.

Plaintiff argues that because the ALJ who adjudicated her claim served under authority delegated from a Commissioner who enjoyed unconstitutional removal protection, the denial of her claim automatically violates the separation of powers, thus necessitating a new hearing. The court disagrees. Unlike Appointment Clause defects, in which the presiding official does not enjoy proper authority to occupy the office, *Lucia v. SEC*, 138 S. Ct. 2044 (2018), agency action is not per se invalid simply because it can be traced back to an official subject to an unconstitutional removal protection. Instead, *Collins* teaches that, when an agency official is properly appointed, there can be no claim that he "exercise[d] . . . power that [he] did not lawfully possess." *Collins*, 141 S. Ct. at 1788; *see also id.* at 1788 n.23 ("the unlawfulness of the removal provision does not strip [an official] of the power to undertake the other responsibilities of his office[.]"). Consequently, "there is no reason to regard any of the actions taken" by officials with tenure protection during this period "as void." *Id.* at 1787; *see also id.* at 1793 (Thomas, J., concurring) (when officials were properly appointed, there is "no barrier to them exercising power[.]").

*Collins* provides, therefore, that actions taken by properly appointed officials—which include both the ALJ who presided over Plaintiff's claim (whose appointment was ratified by then-Acting

---

[9] Plaintiff attached a copy of this Memorandum Opinion to her brief. *See* ECF No. 19-2.

Commissioner Nancy Berryhill who was without tenure protections) and Commissioner Andrew Saul who occupied the office when the ALJ issued the decision (appointed by President Trump with the advice and consent of the Senate)—are not void.

Plaintiff's additional argument that the ALJ also enjoyed for-cause protection similar to the Commissioner, further demonstrating the unconstitutionality of the decision on her benefits claim, *see* Pl. Br. 8-11, is equally unavailing. Although *Collins* failed to involve such a dual-layer removal scheme, a recent case from the Ninth Circuit is instructive: *Decker Coal Co. v. Pehringer*, 8 F.4th 1123 (9th Cir. 2021). In that case, Decker Coal petitioned for review of an order of the Benefits Review Board that had affirmed the decision of a Department of Labor ALJ awarding benefits to a former coal mine worker under the Black Lung Benefits Act. *Id.* Like Plaintiff here, Decker Coal had alleged an unconstitutional two-layer removal scheme. *Id.* at 1128. The Ninth Circuit rejected this argument and pointed to *Collins*, opining "*Collins* is controlling with respect to the remedy for any unconstitutionality in the removal provisions[,]" and a plaintiff must show compensable harm. *Id.* at 1137.

In sum, Plaintiff simply is unable to show compensable harm. At most, her allegations of harm rely on broad and generalized contentions she was deprived of a government that "preserves the chain of accountability with the President serving as a check on those federal officials and the people as a check on the President." Reply Br. 9 (footnote omitted). Plaintiff has failed to show how the President's supposed inability to remove the Commissioner or the ALJ without good cause possibly could have affected her disability benefits decision. As the Commissioner noted, Plaintiff has pointed to no compensable harm resulting from President Biden's decision to remove Andrew Saul as Commissioner in July 2021. Def. Br. 17. As noted by Associate Justice Kagan in her *Collins* concurrence, "[g]ranting relief" where a plaintiff could not show that the President's inability to remove an agency head actually affected the decision at issue "would, contrary to usual remedial

principles, put the plaintiffs 'in a better position' than if no constitutional violation had occurred." *Collins*, 141 S. Ct. at 1801 (Kagan, J., concurring).

Plaintiff has demonstrated no actionable harm. This allegation of error is dismissed. *See also* S*tubbs v. Kijakazi,* , No. CV 6:20-3606-MGL-KFM, 2022 WL 557479, at *3 (D.S.C. Feb. 24, 2022) (finding remand on this constitutional argument unnecessary; collecting several cases and noting courts in the Fourth Circuit to be in accord).

III.     Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court finds that Plaintiff has not shown that the Commissioner's decision was unsupported by substantial evidence or reached through legal error. *See Craig,* 76 F.3d at 589; *see also* 42 U.S.C. § 405(g). Therefore, the Commissioner's decision is affirmed.

IT IS SO ORDERED.

July 18, 2022                                        Kaymani D. West
Florence, South Carolina                      United States Magistrate Judge

27